749 F.2d 1106
 LEAF TOBACCO EXPORTERS ASSOCIATION, INC., (the
"Association"), a North Carolina nonprofit
corporation, et al. (collectively the
U.S. Exporters), Appellants,
v.
John BLOCK, Sec. of the U.S. Dept. of Agriculture;
Commodity Credit Corporation, a corporate agency of the U.S.
Dept. of Agriculture; Flue-Cured Tobacco Cooperative and
Stabilization Corporation, Appellees.
American Farm Bureau Federation, Florida Farm Bureau
Federation, Georgia Farm Bureau Federation, Kentucky Farm
Bureau Federation, North Carolina Farm Bureau, South
Carolina Farm Bureau Federation and Virginia Farm Bureau
Federation, Amicus Curiae.
 No. 83-2145.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 1, 1984.
Decided Dec. 5, 1984.
 
 E. Milton Farley, III, Richmond, Va. (Norman A. Scher, Richmond, Va., William B. Ellis, Richmond, Va., Hunton & Williams; F. Kent Burns; Boyce, Mitchell, Burns & Smith, P.A., Raleigh, N.C., on brief), for appellants.
 Aaron B. Kahn, U.S. Dept. of Agriculture, Washington, D.C., Nigle B. Barrow, Jr., Raleigh, N.C. (James K. Dorsett, Jr., Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan; Samuel T. Currin, U.S. Atty., Gary H. Clemmons, Asst. U.S. Atty., Raleigh, N.C., James Michael Kelly, Associate Gen. Counsel, Raymond W. Fullerton, Asst. Gen. Counsel, Washington, D.C., on brief), for appellees.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WILKINSON, Circuit Judge:
 
 
 1
 The Leaf Tobacco Exporters Association, Inc. and its forty-seven member companies challenge here the decision of the Secretary of Agriculture to permit a growers' cooperative to sell its tobacco directly to foreign purchasers. The District Court for the Eastern District of North Carolina dismissed the exporters' claims for want of standing. Because Congress intended the price support program to assist tobacco farmers, we agree with the District Court that the exporters' claims do not fall within the zone of interests created by the relevant statutes. Thus we affirm the District Court's dismissal of this lawsuit.
 
 
 2
 * The Secretary of Agriculture annually sets a support price for flue-cured tobacco.[1] When growers attempt to sell their crops, either in private deals or in auction markets, the Secretary's price provides a floor below which the farmers need not negotiate. Instead, they may consign to the Flue-Cured Tobacco Stabilization Corporation ("the Cooperative") the portion of their crop that cannot command the Secretary's price. The Cooperative pays for the tobacco at the support rate, processes it, stores it, and tries to sell it.
 
 
 3
 The Cooperative's payments to the producers are funded by loans to the Cooperative from the Commodity Credit Corporation ("CCC"), an agency of the Department of Agriculture ("USDA").[2] These loans, accounted separately for each crop year, cover the expenses of processing and storage in addition to the cost of support price payments. The crops held by the Cooperative serve as collateral for the loans, a security interest that the CCC protects by reserving the right to disapprove any Cooperative sale of the tobacco stock under loan. Working together in this way, the Cooperative and the CCC hope to sell the consigned tobacco at prices sufficient to repay the CCC loans and to provide a profit to the Cooperative.
 
 
 4
 Until recently, realization of that goal would result in distribution of the Cooperative profit to its members. The Cooperative's failure to earn complete repayment funds, on the other hand, would result in a loss to be absorbed by the CCC: the CCC could sell the collateral for its own account after the loan had matured, but it otherwise had no recourse against either the Cooperative or the individual farmers. That system has been changed by the No Net Cost Tobacco Program Act, adopted by Congress in 1982 to limit federal tobacco expenditures to administrative costs.[3] The No Net Cost Program, which applies to the 1982 crop and all later crops, provides that shortfalls in loan repayments must be satisfied by the Cooperative and that surpluses must be devoted to a fund insuring payment on outstanding loans. The Cooperative meets these new obligations by withholding from the support price payments to producers who consign their tobacco crops.
 
 II
 
 5
 The CCC, as noted above, reserves in its loan contract with the Cooperative the authority to veto any proposed sale of price-supported tobacco. In exercise of that authority, the CCC has long prohibited the Cooperative from selling its crop directly to foreign purchasers. The Cooperative could export its tobacco only through a foreign customer represented in the United States or through a commodity broker who purchased tobacco and re-sold it abroad. This restriction was not written in statute, regulation, or contract; it was simply the policy of the CCC in approving or disapproving sales. According to CCC officials, the purpose of the policy was to avoid an expensive and perhaps futile Cooperative attempt to compete with dealers for direct foreign sales, an effort likely to antagonize the Cooperative's exporting customers. The CCC preferred to rely on the exporters' expertise and efforts to sell the loan stock tobacco.
 
 
 6
 That policy changed on 30 November 1981, when the Department of Agriculture announced in a press release that the CCC would henceforth permit the Cooperative to sell directly to foreign buyers. Referring to the new No Net Cost Tobacco Program and to the current Cooperative debt to the CCC, the statement suggested that direct sales might reduce Cooperative losses by creating an additional market.[4]
 
 
 7
 The Leaf Tobacco Exporters Association and its forty-seven member companies, now appellants in this case, objected vigorously to the November 30 press release. The tobacco dealers each claimed to have participated in the export market, and they each claimed to have invested in that market in reliance on the previous rules of the CCC. With the change of policy, they feared that their participation and their investment were threatened by a new competitor, the Cooperative, a competitor that was uniquely advantaged because it was financed by CCC loans with attractive government interest rates.[5] The exporters argued that the Secretary of Agriculture had violated the Administrative Procedure Act by failing to notify concerned parties of the contemplated change, by failing to receive comments on the proposal, and by failing to publish the basis and purpose of his action. They further argued that the Secretary, in addition to his procedural non-compliance, had violated the statutes that govern the federal tobacco program--the CCC Charter Act and the 1949 Agriculture Adjustment Act--by ignoring in his decision a factor that he was required to consider: the interests of the tobacco dealers. According to the exporters, this departure from the mandatory criteria made the Secretary's decision arbitrary, capricious, and an abuse of the discretion that he enjoys in administering the tobacco program.
 
 
 8
 The dealers pressed these arguments in a meeting with the USDA General Counsel, in a letter to the Secretary, and in a lawsuit filed in District Court. On this appeal, we do not resolve the merits of the dealers' claims. We affirm dismissal of their suit because we conclude that the exporters do not have standing to complain in federal court about the method or the wisdom of the Secretary's decision.
 
 III
 
 9
 The question of a plaintiff's standing to sue is one that we approach with caution. The doctrine of standing is axiomatic in its complexity; judges and scholars have agreed that the concept is "among the most amorphous in the entire domain of public law." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (quoting Professor Paul A. Freund). This is especially true of the "zone of interest" principle first articulated by the Supreme Court in Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). From its inception, the "zone test" has suffered academic criticism.[6] Lower federal courts have drawn imperfect guidance from the Data Processing doctrine: some courts have ignored the test, others have opposed it, and several have construed it in different ways. See Control Data Corp. v. Baldridge, 655 F.2d 283, 293-94 (D.C.Cir.1981), cert. denied, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981) (citing cases).
 
 
 10
 The Supreme Court, finding little occasion for further application of the test, has not yet responded to this criticism. But although the Court has applied the test infrequently,[7] it has cited the test repeatedly since 1970.[8] Such continued reference leaves no doubt that the zone test remains a living doctrine.[9] And reflection leaves little doubt that its life is a useful one, serving several purposes that are illustrated in the instant action.
 
 
 11
 The tobacco exporters, like any party seeking relief in federal court, must satisfy both constitutional and nonconstitutional requirements in order to have standing to sue. The constitutional requirements are those that relate to the existence of a case or controversy, specifically to questions of injury-in-fact. The zone test is a nonconstitutional, or prudential requirement, asking "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Data Processing, 397 U.S., at 153, 90 S.Ct. at 829. The zone test supplements constitutional requirements of public law standing, implementing separation of powers principles even where a case or controversy plainly exists.
 
 
 12
 The Court intended by the zone test to separate the determination of a plaintiff's standing from the adjudication of the plaintiff's substantive claims and to vindicate the right to litigate for plaintiffs barred under prior standing doctrine. Id., at 153-154, 90 S.Ct. at 829-830. That reasoning, however, cannot fully justify the zone test. The test must also bar some potential plaintiffs from federal court; otherwise, it would be "a requirement that must be observed only when satisfied." Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982). Examined from this perspective of its exclusionary effects, the zone test rests on the need to secure the benefits of a statutory program for the groups that Congress intended to benefit.
 
 
 13
 That need cannot be entirely satisfied by substantive rejection of an improper plaintiff's claims, for full litigation would contemplate a group of participants and a forum of decision-making that Congress did not establish in the statutory program, consequences of considerable importance. To permit the plaintiffs to litigate the claims is to grant them rights of participation in the shaping of the program, surely among the most important benefits that any statutory scheme can confer. In regulating such participation, the zone test furthers the general recognition of standing doctrine that the decision to enforce legal rights usually belongs to the possessor of those rights, Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), and the general recognition of standing doctrine that the identity of litigating parties will influence the presentation of issues and affect the ability of the court to resolve those issues justly, Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The need for a proper forum of decision-making is no less important. To permit the courts to hear the claims is to sanction intervention into legislative provinces that neither invite nor warrant judicial review. In limiting such intervention, the zone test furthers the general recognition of standing doctrine that courts should "exercise self-restraint in the utilization of our power to negative the actions of the other branches." United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1973) (Powell, J., concurring).[10]
 
 
 14
 Although the zone test thus shares the broad purposes of other elements of standing doctrine, it is a distinct and independent condition of standing. That independence is illustrated in the present case, for the exporters have clearly satisfied all constitutional requirements of standing. The plaintiffs, complaining that they will face increased competition from the direct entry of the Cooperative into international tobacco markets, have alleged an injury in fact. The injury, made possible by the Secretary's removal of his restriction on Cooperative sales, resulted from "the putatively illegal conduct of the defendant." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). And the injury, at least arguably, would be alleviated by a decision favorable to the exporters. Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).
 
 
 15
 Satisfaction of these constitutional requirements does not, however, fulfill the plaintiffs' obligation to meet prudential standing criteria. In Data Processing, undisputed competitive injury did not relieve the plaintiffs from demonstrating that their interests were protected by the statute in question. So, too, the competitive injury of the exporters does not exempt them from the zone of interest requirement. The fact that a standing requirement is prudential does not mean that its application is discretionary. Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 137 n. 37 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Congress, of course, retains its authority to displace prudential limitations to the extent permitted by the Constitution. See, e.g., Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). But the lower federal courts lack similar authority without congressional action. It would indeed be anomalous if a principle designed to limit the role of the judicial branch could be waived by judges desiring to entertain a particular statutory challenge.
 
 
 16
 We recognize that if the right to challenge the Secretary's decision is left solely to the statutory beneficiaries, here the growers, no challenge is likely to eventuate. The Supreme Court, however, has clearly held that the standing of a possible plaintiff does not turn on the availability of other plaintiffs, stating that "the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." Valley Forge, 454 U.S., at 489, quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974). The Court has thus established that the dangers of unwarranted judicial oversight of legislative and executive action outweigh, in its judgment, the risk that lack of a plaintiff with standing may sometimes mean no oversight at all.
 
 IV
 
 17
 The critical relationship between congressional purpose and the plaintiffs' interests informs the application of the zone test in the present action. We now turn to the question of "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Data Processing, 397 U.S., at 153, 90 S.Ct. at 829. The "statute in question" in this suit under the Administrative Procedure Act must be the legislative enactments under which the plaintiffs claim to be "protected or regulated." Id., at 155-56, 90 S.Ct. at 830-31. In this case, the exporters cannot contend that their competitive interests are regulated by the Secretary's decision or by any aspect of the tobacco program. The exporters are not compelled to avoid or to undertake any activity, and unlike the situation in Cotovsky-Kaplan Physical Therapy Ass'n Ltd. v. United States, 507 F.2d 1363 (7th Cir.1975), direct regulation of the Cooperative does not create indirect regulation of the exporters. If the exporters were in fact regulated, they could rely for standing on the statute that allegedly authorized the contested government action.[11] See Note, A Defense of the "Zone of Interests" Standing Test, 1983 Duke L.J. 447, 461 n. 85. In the absence of such regulation, plaintiffs contend that their competitive interests are protected by the tobacco program. To support that contention, they point to several passages in the CCC Charter Act and the Agricultural Adjustment Act of 1949. We address the referenced statutory provisions in turn.
 
 
 18
 The 1949 Act mentions commodity brokers at only one point, 7 U.S.C. Sec. 1427, which begins with the statement that
 
 
 19
 The Commodity Credit Corporation may sell any farm commodity owned or controlled by it at any price not prohibited by this section. In determining sales policies for basic agricultural commodities or storable nonbasic commodities, the Corporation should give consideration to the establishing of such policies with respect to prices, terms, and conditions as it determines will not discourage or deter manufacturers, processors, and dealers from acquiring and carrying normal inventories of the commodity of the current crop.
 
 
 20
 This provision suggests standing for the dealers if they allege that CCC sales interfere with their ability to maintain tobacco inventories. But as Professor Davis has emphasized, the zone test requires the particular interest asserted by the plaintiff to fall within the relevant zone. K. Davis, Administrative Law Text Sec. 22.02 (3d ed. 1972); see also Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 142 n. 76 (D.C.Cir.1977) cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Here the dealers have raised no question about the availability of tobacco for inventory. Furthermore, their complaint runs to policies governing Cooperative sales, not to policies governing CCC sales. Although the CCC must approve Cooperative sales, the two institutions remain distinct; Cooperative sales policies do not duplicate CCC sales policies. Cooperative sales practices are limited by contract with the CCC. CCC sales practices are limited by statute under 7 U.S.C. Sec. 1427. This portion of the 1949 Act is thus irrelevant to the asserted interests of the exporters and to the decision of the Secretary; it must consequently be irrelevant to the issue of standing.
 
 
 21
 The exporters argue also that two clauses in the CCC Charter Act offer protection for their interests in this situation. The first passage, taken from the CCC statement of purpose in 15 U.S.C. Sec. 714, declares one function of the CCC to be "facilitating the orderly distribution of agricultural commodities." We agree with the exporters that the preamble of a statutory complex may shed binding light on its specific provisions, but we find no logical relationship between the exporters' claims and "the orderly distribution of agricultural commodities." The plaintiffs allege that the Secretary should have considered their competitive injuries in regulating sales by the Cooperative. They do not allege that the Secretary's decision--even if improper--will lead to chaos in the tobacco markets. Moreover, we cannot equate the advent of increased competition in tobacco markets with a dissolution of order in those markets. Thus the excerpted passage does not even arguably protect the plaintiffs' asserted interests.
 
 
 22
 Of course, the import of 15 U.S.C. Sec. 714 might reach beyond the literal sense of "orderly distribution" to express a broad congressional concern for commodities markets and for participants in those markets. But this more general zone of interests is much too blurred for us to see the plaintiff's standing in it. As Judge Scalia has noted, the reliability of the test as a gauge of congressional purpose varies directly with the specificity of the statutory zone. Community Nutrition Institute v. Block, 698 F.2d 1239, 1256 (D.C.Cir.1983) (Scalia, J., concurring in part and dissenting in part), rev'd on other grounds, --- U.S. ----, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). To adopt the exporters' proposed general reading of the mandate for "orderly distribution of agricultural commodities" would be to bring within the tobacco program plaintiffs that Congress could not plausibly have meant to embrace by its limited phrase. We cannot adopt that general reading.
 
 
 23
 The tobacco dealers point finally to 15 U.S.C. Sec. 714c, the enumeration of CCC powers. The pertinent clause provides that
 
 
 24
 In the Corporation's purchasing and selling operations with respect to agricultural commodities (except sales to other Government agencies), and in the warehousing, transporting, processing, or handling of agricultural commodities, the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce.
 
 
 25
 Unlike the earlier 7 U.S.C. Sec. 1427 restriction on CCC policies, this provision cannot be dismissed as irrelevant to the exporters' claims. Both clauses refer to the sales operations of the CCC, but those references must be read in their contexts. The excerpt from 7 U.S.C. Sec. 1427 prefaces a specific list of price guidelines for CCC sales, guidelines that do not govern the contractually determined prices permissible for Cooperative sales. The excerpt from 15 U.S.C. Sec. 714c delineates in part the extent of CCC authority; its specified limitations commend themselves to the complete range of CCC market activities, including both direct CCC sales practices and CCC supervision of Cooperative sales practices. This court has, consistently with that context, previously noted that Sec. 714c applies to the warehousing of crops used as collateral for CCC loans. Worthington v. Commodity Credit Corporation, 263 F.2d 178, 179 (4th Cir.1959).
 
 
 26
 But the possible relevance of Sec. 714c to the loan stock only ensures an appropriate statute for "zone of interests" analysis. We must still examine the connection between the plaintiffs' asserted interest and the statutory solicitude for "the usual and customary channels, facilities, and arrangements of trade and commerce." The dealers argue that they are "usual and customary" channels for the exportation of tobacco and that their competitive injuries therefore "arguably fall within the zone of interests to be protected" by the statute. This reasoning, though plausible for the excerpt, is unpersuasive for the underlying statute. A suggested reading of statutory language cannot satisfy the zone test when that reading is contradicted by the express purpose of the program in which the language takes meaning. The CCC Charter Act--like the 1949 Agricultural Adjustment Act--is patently devoted to advancing the economic interests of farmers. The first words of the Act declare that the CCC is created "for the purpose of stabilizing, supporting, and protecting farm income and prices," and the entire program, as outlined above in Section I, attempts to ensure minimum revenues for growers. In the situation before the court, the farmers and the exporters are competitors: the exporters' claim of injury rests on the premise that a gain to farmers means a loss to exporters. Conversely, protection for the exporters would contemplate economic injury to the farmers. And without some clearer signal of congressional intent to detour, we cannot conclude that the CCC Charter Act abruptly reverses direction and subordinates the farmers' interests to the interests of their competitors, the exporters.
 
 
 27
 To accept the plaintiffs' interpretation would violate the basic principle of construction that statutes should be read, if possible, as harmonious texts. Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631-32, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973). The suggestion is particularly inappropriate in light of the alternative interpretations that can be reconciled with the purpose of the Act--for example, that the "usual and customary channels" language affords protection to private businesses where they are threatened by creations of the CCC.[12] Of course, we need not now adopt that or any other interpretation of the Act: the zone test does not require a court to find the best meaning of a statute. But the test does require a court to reject meanings inconsistent with congressional purpose and to reject plaintiffs whom Congress has affirmatively decided not to protect. See K. Davis, Administrative Law Text Sec. 22.08 (3rd ed. 1972).
 
 V
 
 28
 The zone test was created in Data Processing to promote competitor standing, and the tobacco dealers see unfortunate irony in its application here to deny competitor standing. This irony is not, in our view, inconsistency. The zone of interests test does not allow for competitor standing in all cases. See, e.g. Clinton Community Hospital Corp. v. Southern Maryland Medical Center 510 F.2d 1037 (4th Cir.1975), cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). Comparison with Data Processing is instructive. The plaintiffs in Data Processing relied for standing on Sec. 4 of the Bank Service Corporation Act of 1962, which could be read to regulate banks for the protection of various groups in society; it was at least arguable that data processing companies belonged among the groups benefitting from the design of the banking system. 397 U.S., at 155-56, 90 S.Ct. at 830-31. The plaintiffs in this case, in contrast, point to a statutory program that explicitly serves the interests of identifiable groups, just as the procedural rule in In re Swearingen Aviation, 605 F.2d 125 (4th Cir.1979) explicitly served the interest of an identifiable group. Where Congress has in this manner clearly defined the class to be protected, the zone test works to prevent groups outside of the class from usurping the legislative entitlement. This goal is especially urgent when, as here, such usurpation would necessarily come at the expense of the intended beneficiaries. The purpose of the zone test, operating through the purpose of the tobacco program, is therefore served by the denial of competitor standing for the exporters.
 
 
 29
 We recognize that our answer to the question of standing has trespassed on issues that would also have been addressed in a full adjudication of the exporters' substantive claims. The conclusion that the exporters' competitive interests are not within the zone of interests protected by the tobacco program compels the conclusion that the Secretary need not have considered the exporters' competitive interests in administering the program. We have attempted to keep our interference to a minimum, intimating no opinion of the rulemaking status of the Secretary's decision or of the notice and the opportunities for comment that the Secretary should have provided under the Administrative Procedure Act. We cannot, however, allow the specter of the merits to eliminate the exclusionary force that a standing test must have.
 
 
 30
 It may appear unjust that a zealous advocate, armed with concrete injury, should be barred from challenging an executive action that it finds unlawful: undeniably, the zone test operates here against a plaintiff that is in many respects a traditional type of litigant. The injustice may appear particularly acute in light of the exporters' significant, although hardly disinterested, contribution to the operation of the federal tobacco program. But every executive action portends endless adverse impacts and infinite adverse ramifications. We decline to convert the zone of interests test to one that calibrates zones of impact or zones of consequence. Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 144 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The zone of interest test is a construct that permits government officials to act in furtherance of congressional purposes without the prospect of protracted court challenges from those whose interests Congress clearly did not protect. The Secretary's ban on foreign sales by growers' cooperatives has long been a subject of political contention between two robust segments of the tobacco industry. It is appropriate that this matter be resolved in the halls of Congress and the Department of Agriculture, not in the courtrooms of our country.
 
 The judgment of the District Court is
 
 31
 AFFIRMED.
 
 
 
 [1]
 The statutory framework of the price support program is set forth in 7 U.S.C. Sec. 1421 et seq
 
 
 [2]
 The relationship between the Cooperative and the CCC is governed by 7 C.F.R. 1464.1, et seq
 
 
 [3]
 7 U.S.C. Sec. 1445-1, 7 U.S.C. Sec. 1445-2
 
 
 [4]
 The press release stated:
 USDA AUTHORIZES SALE OF FLUE-CURED TOBACCO TO FOREIGN BUYERS. Washington, Nov. 30--Foreign tobacco buyers now will be allowed to purchase U.S. flue-cured tobacco that has been placed under government price support loan, Deputy Secretary of Agriculture Richard E. Lyng said today.
 Lyng said under the change, the Flue-Cured Tobacco Cooperative Stabilization Corporation--responsible for handling flue-cured tobacco placed under loan with the U.S. Department of Agriculture's Commodity Credit Corporation--will for the first time be permitted to make direct sales to foreign buyers.
 The No Net Cost Tobacco Program Act of 1982 mandates that any future losses, either of principal or interest, must be borne by the tobacco growers. Lyng said the change announced today "may reduce such losses by providing an additional option for selling the cooperative's tobacco stock for export."
 Currently, the tobacco cooperative has under loan to CCC 653 million pounds of flue-cured tobacco with a loan balance of $1.03 billion.
 
 
 [5]
 The interest rate on CCC loans to the Cooperative is based monthly on the cost of money to the Treasury
 
 
 [6]
 See, e.g., Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief, 83 Yale L.J. 425 (1974); Marquis, The Zone of Interests Component of the Federal Standing Rules: Alive and Well After All?, 4 U.Ark. Little Rock L.J. 261 (1981); 4 K. Davis, Administrative Law Treatise Sec. 24:17 (2d ed. 1983)
 
 
 [7]
 The Court has expressly applied the zone test to statutory claims only in Data Processing, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); and Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). The Court has expressly applied the zone test to a constitutional claim only in Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977)
 
 
 [8]
 See Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); United States v. Richardson, 418 U.S. 166, 176 n. 9, 94 S.Ct. 2940, 2946 n. 9, 41 L.Ed.2d 678 (1974); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 227 n. 16, 94 S.Ct. 2925, n. 16, 41 L.Ed.2d 706 (1974); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982); Allen v. Wright --- U.S. ----, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)
 
 
 [9]
 Indeed, this court has frequently acknowledged as much. See Whitley v. Wilson City Bd. of Ed., 427 F.2d 179 (4th Cir.1970); M.M. Crockin v. Portsmouth Redevelopment and Housing Authority, 437 F.2d 784 (4th Cir.1971); West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir.1971); Wilke v. Department of the Army of the United States, 485 F.2d 180 (4th Cir.1973); Clinton Community Hospital Corp. v. Southern Maryland Medical Center, 510 F.2d 1037 (4th Cir.1975), cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); In re Swearingen Aviation Corporation, 605 F.2d 125 (4th Cir.1979); Motor Coach Industries, Inc. v. Dole, 725 F.2d 958 (4th Cir.1984); Hicks v. Southern Maryland Health Systems Agency, 737 F.2d 399 (4th Cir.1984). Cf. Control Data Corp. v. Baldridge, 655 F.2d 283, 293 n. 18 (D.C.Cir.1981), cert. denied, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981)
 
 
 [10]
 This policy is also served by the failure of federal jurisdiction when Congress has precluded judicial review of government action or has precluded judicial review of government action at the request of particular plaintiffs. See, e.g., Block v. Community Nutrition Institute, --- U.S. ----, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Our holding in no part rests on this doctrine of reviewability. But although the statutes in question do not preclude the review sought by the exporters, see 7 U.S.C. Sec. 1429, the absence of congressional preclusion of review by a party is not sufficient to confer standing on that party
 
 
 [11]
 The exporters' reliance on the Agricultural Adjustment Act of 1938 is, when unaccompanied by any indication of regulation in fact, far too tenuous to afford the exporters standing as a regulated party. The 1938 Act states in part that "It is declared to be the policy of Congress ... to regulate interstate and foreign commerce in cotton, wheat, corn, tobacco, and rice to the extent necessary to provide an orderly, adequate, and balanced flow of such commodities in interstate and foreign commerce..." 7 U.S.C. Sec. 1282. To find exporter standing solely on the basis of that general passage would distort the interpretation of Congressional purpose for the reasons described below in the discussion of 15 U.S.C. Sec. 714
 
 
 [12]
 The Cooperative is not a mere creation of the CCC. Hiatt Grain & Feed, Inc. v. Bergland 602 F.2d 929 (10th Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); Texas Peanut Producers Board v. United States, 649 F.2d 328 (5th Cir.1981). Its independence is particularly apparent under the requirements of the No Net Cost Tobacco Program