786 F.2d 621
 54 USLW 2481
 BRANCH BANK AND TRUST COMPANY; First Union National Bank;
NCNB National Bank of North Carolina; The Planters National
Bank & Trust Co.; United Carolina Bank and Wachovia Bank &
Trust Co., N.A., Appellants,
v.
NATIONAL CREDIT UNION ADMINISTRATION BOARD; E.F. Callahan,
Chairman of the National Credit Union Administration Board;
National Credit Union Administration and the North Carolina
Local Government Employees Federal Credit Union, Appellees.
 No. 85-1522.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1985.
Decided March 18, 1986.
 
 John R. Jordan, Jr. and Henry W. Jones, Jr. (Robert R. Price, William B. Aycock, Edmund D. Aycock, Jordan, Brown, Price & Wall, Raleigh, N.C., on brief) for appellants.
 Mark A. Pogue, Appellate Staff, Civ. Div., Dept. of Justice (Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Samuel T. Currin, U.S. Atty., Raleigh, N.C., Anthony J. Steinmeyer, Washington, D.C., on brief) for Federal appellees.
 John V. Hunter, III, Hunter, Wharton & Howell, Raleigh, N.C., for appellee the North Carolina Local Government Employees Federal Credit Union.
 Before WIDENER and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WILKINSON, Circuit Judge:
 
 
 1
 This dispute requires us to consider once again the standing of those seeking to protect their market position from adverse administrative action, an issue we addressed in Leaf Tobacco Exporters Association, Inc. v. Block, 749 F.2d 1106 (4th Cir.1984). Appellants here, six large commercial banks in North Carolina, fear the competition of the North Carolina Local Government Employees Credit Union (LGCU) and challenge the decision by the National Credit Union Administration (NCUA) approving the formation of the credit union. Specifically, the banks assert that the charter of LGCU was granted in violation of the Federal Credit Union Act of 1934. The district court, relying on Leaf Tobacco, held that appellants lacked standing because their interests fell outside the zone of interests protected or regulated by the statute. We affirm.
 
 
 2
 We hold to the principle that it is primarily the province of Congress to consider and weigh the interests of those potentially affected by legislation and subsequent administrative action. A statute reflects the considered judgment of Congress that a particular course of action is desirable even though it inevitably advances some interests at the expense of others and affords only certain interests consideration in the administrative process. In deference to this legislative function, the judiciary will intervene only at the instance of those interests arguably within the zone of interests regulated or protected by the law in question. Here, Congress acted to enhance credit availability for people of limited means and collateral, and evidenced no concern to protect or consider the interests of banks at the expense of them. To allow the banks to challenge the administrative action would thwart the legislative mandate and introduce a voice into the process never anticipated or intended by Congress.
 
 I.
 
 3
 This litigation follows a similar dispute over the legitimate scope of a credit union charter under North Carolina law. In September, 1977 the North Carolina Credit Union Administration approved an expansion of the North Carolina State Employees' Credit Union (SECU) membership to include all local government employees who participated in state administered retirement systems and federal employees working in conjunction with them. The North Carolina Bankers Association, Savings and Loan Association, and Savings and Loan League challenged this action as a violation of state law, which limits membership in a state credit union to those possessing a "common bond." N.C.G.S. Sec. 54-109.26. The Supreme Court of North Carolina upheld the challenge, and ordered the removal of local government employees from SECU's field of membership. In re Appeal of North Carolina Savings and Loan League, 302 N.C. 458, 276 S.E.2d 404 (1981). This action left some 30,000 individuals without credit union services.
 
 
 4
 Frustrated in their attempts to form a state credit union, ten local government employees sought to establish a federal credit union to serve "[e]mployees and elected and appointed officials of city and county government units in North Carolina." Upon receipt of the charter application, the National Credit Union Administration conducted an exhaustive investigation into the propriety and viability of the proposed credit union. Its report noted that the majority of North Carolina municipalities are so small that they could not support credit unions by themselves and that many are "geographically located where no existing credit union services are available." In light of the need for credit union services and the perceived enthusiasm of local employees, the report recommended approval of the application. E.F. Callahan, Chairman of the NCUA Board, approved the organization certificate on March 24, 1983.
 
 
 5
 The LGCU began operations on July 1, 1983, using the services and facilities of the SECU under a fee-for-service contract. The credit union grew rapidly, enlisting more than 6000 members from 245 local governments in North Carolina by March, 1984. The LGCU made its first loan in September, 1983 and within three weeks loaned $1.5 million to 752 members.
 
 
 6
 Appellants brought this action under the Administrative Procedure Act, 5 U.S.C. Sec. 704, to challenge the decision by NCUA to grant LGCU's organizational certificate. They allege that the decision violated the requirement of 12 U.S.C. Sec. 1759 that "Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." Appellants seek to protect themselves from competition from LGCU, which, like all federal credit unions, enjoys advantages bestowed by federal law. See, e.g., 12 U.S.C. Sec. 1768 (exempting credit unions from taxation). We need not consider the merits of these claims, however, for we conclude that they fall outside the zone of interests protected by Congress in the National Credit Union Act.*
 
 II.
 
 7
 Appellants here have satisfied the constitutional requirements of standing. In seeking reversal of the NCUA decision approving the formation of LGCU, appellants have asserted harm to their business interests. The advent of a substantial credit union may well compete with banks for depositors, borrowers, and other consumers of financial services. The banks have accordingly shown that they "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). This injury, moreover, can be "fairly traced to the challenged action" and "is likely to be redressed by a favorable decision" by the court. Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976).
 
 
 8
 Satisfaction of constitutional standing requirements does not, however, end our inquiry. See, e.g., Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152-54, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970); Leaf Tobacco, 749 F.2d at 1112. Plaintiffs must also satisfy prudential requirements established by courts to advance values imperfectly realized by constitutional limitations alone. Among the foremost prudential requirements is the "zone of interests" principle. First articulated in Data Processing, 397 U.S. at 153, 90 S.Ct. at 830, it requires that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Though we recently considered in detail the merits of the zone test, Leaf Tobacco, 749 F.2d at 1110-13, it is useful to re-emphasize briefly its role in our federal system.
 
 
 9
 The zone test serves primarily to advance the separation of powers values that constitute a central concern of standing principles in general. See Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Legislation and subsequent administrative actions inevitably affect a multitude of groups and individuals in our complex and highly integrated society. This is perhaps especially significant where, as here, legislation alters the structure of the marketplace. A test requiring only injury in fact--the constitutional minimum--would necessarily obstruct and undermine legislative control and guidance over essentially political issues by conferring standing to litigate on a host of parties whose interests Congress failed to protect. This litigation would necessarily obstruct the operation of programs established by Congress and "come at the expense of the intended beneficiaries." Leaf Tobacco, 749 F.2d at 1115. For this reason, "the zone test rests on the need to secure the benefits of a statutory program for the groups that Congress intended to benefit." Id. at 1111. See also, id., at 1116 ("The zone of interest test is a construct that permits government officials to act in furtherance of congressional purposes without the prospect of protracted court challenges from those whose interests Congress clearly did not protect.")
 
 
 10
 The zone test serves not only to protect against frustration of Congressional purpose, but also to ensure proper respect for the legislative process. When drafting legislation, Congress is uniquely suited to consider the voices of those potentially injured or benefitted by its action. Hearings, lobbying, and letters accompany the consideration of nearly every bill before it. The bill as passed represents a determination by Congress of the best course of action in light of the effect this action will have on a broad range of interests in society. This is the democratic process at work, and it inevitably produces "losers." Litigation, however, should not be seen as an extension of the legislative process. Proper respect for the judgment of Congress instead requires that some degree of finality be accorded its balancing of interests. Otherwise, courts would be asked to review the legislative mandate for no other reason than the fact that Congress is unable to protect or advance some interests without sacrificing others. To guard against such overreaching, the zone test dictates that parties left unprotected or unregulated by legislation must return to the legislative process if they are dissatisfied with its outcome. Absent some evidence that the interests of these parties are a subject of continuing concern in the statutory scheme, we will not allow them to reopen the legislative inquiry in a federal court.
 
 III.
 
 11
 Appellants urge that we ignore these principles and forego the application of the zone test on these facts. They perceive a factual distinction between this case and Leaf Tobacco that they believe makes the zone test inapplicable here. Specifically, appellants assert that Leaf Tobacco did not involve a mandatory limitation on administrative action such as that found in the common bond provision, and that accordingly review should proceed without consideration of the zone test.
 
 
 12
 We see no merit in either the factual or legal distinction advanced by appellants to escape this prudential requirement. Both Leaf Tobacco and the instant case arose under the Administrative Procedure Act, and both involved claims that an administrator "depart[ed] from the mandatory criteria" he was "required to consider" under the substantive statute at issue. Leaf Tobacco, 749 F.2d at 1110. Nothing in Leaf Tobacco or any other zone case rested on the existence of discretionary authority. The zone test instead rests on concerns as to the proper roles of courts and Congress which apply regardless of whether the statutory language at issue is restrictive or permissive. We have noted, moreover, that application of the zone test is not discretionary, id. at 1112, and see no reason to depart from that view here. Even critics of the zone test recognize its usefulness and propriety where a statute is enacted to protect or serve the interests of an identifiable segment of society, here, persons with limited resources to secure credit. See 4 K. Davis, Administrative Law Treatise Sec. 24-17, at 279 (2d ed. 1983).
 
 IV.
 
 13
 Turning to the facts of this dispute, we have no trouble concluding that appellants have failed to meet the requirements of the zone test. The question, of course, is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Data Processing, 397 U.S. at 153, 90 S.Ct. at 829. Appellants are not "compelled to avoid or to undertake any activity," Leaf Tobacco, 749 F.2d at 1113, under the National Credit Union Act or its common bond provision, and accordingly do not claim to be regulated by the statute. We thus focus on whether the banks' interests are arguably within the zone of those protected by the statute. Examination of both the general purposes of the statute and the specific interests served by the common bond requirement convinces us that the interests of banks are far removed from the interests of the credit union members protected by these provisions.
 
 
 14
 "The sources pertinent to this examination are the language of the relevant statutory provisions and their legislative history." Control Data Corp. v. Baldridge, 655 F.2d 283, 294 (D.C.Cir.), cert. denied, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). We consider first the general statutory context in which the specific provision is found. Congress passed the Federal Credit Union Act of 1934 in response to the existence of usurious rates of interest and the widespread unavailability of credit for people of limited resources, conditions that hampered economic recovery. The Act was accordingly designed "to make more available to people of small means credit for provident purposes." S.Rep. No. 583 73d Cong., 2d Sess. 1 (1934). See also, H.R.Rep. No. 2021, 73d Cong., 2d Sess. 1 (1934). The federal credit union system was therefore established as an alternative to an unacceptable credit structure, a structure that included banks. Thus, the general purposes of the Act, rather than indicating a desire to protect banks, instead suggest that competitive interests of banks were purposefully sacrificed by Congress to the interests of facilitating credit for people of limited personal means. Absent any specific evidence to the contrary, it would be anomalous to conclude that the banks are somehow protected by this action.
 
 
 15
 Appellants, however, would have us find in 12 U.S.C. Sec. 1759 a congressionally mandated fetter on the operation of the Act designed to "protect competitors who do not enjoy the favors and advantages inherent in a credit union's operations." We see no evidence, however, other than this bald assertion by appellants, that Congress "abruptly reverse[d] direction and subordinate[d] the [credit unions'] interests to the interests of their competitors." Leaf Tobacco, 749 F.2d at 1115. Consistent with the general goals of the statute, the common bond provision was designed to ensure the cohesive operation of credit unions rather than to limit their reach in an effort to protect banks.
 
 
 16
 The purpose of the common bond provision is evident from the nature of the institutions created by the Act. A credit union has been aptly described as "a democratically controlled, cooperative, nonprofit society organized for the purpose of encouraging thrift and self-reliance among its members.... [It] is fundamentally distinguishable from other financial institutions in that the customers may exercise effective control." La Caisse Populaire St. Marie v. United States, 563 F.2d 505, 509 (1st Cir.1977). The union's purposes are threatened by directors that are unmindful of members' funds or unresponsive to their collective interests. Thus Congress ensured that federal credit unions would retain their character as self-managed cooperatives by establishing democratic principles of decision and control. See, e.g., 12 U.S.C. Secs. 1760-1764. The common bond provision reinforces this aim by advancing the formation of credit unions among groups that may realistically operate with unity of purpose. It encourages the election of directors who possess a common interest or occupation with the membership they serve. See Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration, 477 F.2d 777, 783 (10th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973); National Alliance of Postal and Federal Employees v. Nickerson, 424 F.Supp. 323, 324-26 (D.D.C.1976). See also Appeal of Savings and Loan League, 276 S.E.2d at 411. There is no evidence from any source cited to this court that Congress also intended by this provision to protect the competitive interests of banks. Given the specific rationale for the common bond requirement, we will not attribute to it a meaning that is at cross purposes with the general goals of the statute. If the NCUA were seen to violate the common bond requirement to the detriment of union members, they would possess standing to sue. The banks, by virtue of the statute, simply do not occupy a similar position.
 
 
 17
 Though this holding leaves appellants without recourse in a federal court, it hardly means that they are powerless to pursue their goals elsewhere. Banks are not without significant power and influence in the executive and legislative process. Congress, moreover, has shown in a related context that it knows how to direct attention to the interests of other financial institutions when it so desires. See, e.g., 12 U.S.C. Sec. 1464(e) (allowing formation of savings and loan only where this can be achieved "without undue injury to properly conducted existing local thrift and home financing institutions"). We believe, however, that the decision to allow consideration of such interests at the potential expense of statutory beneficiaries is, in the first place, properly left to the Congress, and we refuse to intervene on behalf of those interests where Congress has not done so.
 
 
 18
 Accordingly, the decision of the district court is
 
 
 19
 AFFIRMED.
 
 
 
 *
 We have also reviewed appellants' challenge under the Fifth Amendment and find it to be meritless