**AMERICAN POSTAL WORKERS UNION, AFL–CIO, and National Association of Letter Carriers, AFL–CIO, Plaintiffs,**

**v.**

**UNITED STATES POSTAL SERVICE, Defendant.**

**Civ. A. No. 87–3199.**

United States District Court, District of Columbia.

Dec. 20, 1988.

Anton G. Hajjar, O'Donnell, Schwartz & Anderson, Washington, D.C., for American Postal Workers Union, AFL–CIO.

Richard N. Gilberg, Sophia E. Davis, Cohen, Weiss and Simon, New York City, for National Ass'n of Letter Carriers, AFL–CIO.

Jay B. Stephens, U.S. Atty., John D. Bates and Wilma A. Lewis, Asst. U.S. Attys., of counsel, Charles D. Hawley, Catherine V. Pagano, Law Dept., U.S. Postal Service, for defendant.

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

The United States Postal Service (the "Service") enjoys a statutory monopoly over the delivery of mail in and from the United States. This monopoly, as the Supreme Court recently noted, "has prevailed in this country since the Articles of Confederation," and is intended to ensure "prompt, reliable, and efficient services to [postal] patrons in all areas." *Univ. of California v. Public Employment Relations Bd.,* — U.S. —, 108 S.Ct. 1404, 1408, 99 L.Ed.2d 664 (1988) (quoting 39 U.S.C. § 101(a)). The monopoly is embodied in the Private Express Statutes (the "PES"). 18 U.S.C. §§ 1693–1699; 39 U.S.C. §§ 601–606. The monopoly serves its purpose by ensuring that the revenues available to the Service are not endangered by private competition in less costly, and thus more profitable, segments of the mail delivery market.

Although Congress has granted the Service a complete monopoly in the PES, Congress has also granted the Service the power to suspend that monopoly in certain situations. Under 39 U.S.C. § 601(b), the Service "may suspend the operation of any part of [the PES] upon any mail route where the public interest requires the suspension." This lawsuit concerns the Service's decision to voluntarily suspend its monopoly under the PES with respect to that part of the mail-delivery market known as "international remailing." The regulation which suspended the Service's monopoly effectively defines "international remailing" by its description of what is permitted: the regulation "permits the uninterrupted carriage [by private entities] of letters from a point within the United States to a foreign country for deposit in its domestic or international mails for delivery to an ultimate destination outside of the United States." 39 C.F.R. § 320.8. The Service issued the regulation on August 20, 1986.

The plaintiffs, the American Postal Workers Union and the National Association of Letter Carriers (hereinafter the "Unions"), filed this suit on November 25, 1987.[1] They allege that the Service's decision to permit private international remailing violated the APA in two respects. First, they claim that the decision was arbitrary, capricious and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A). Second (and not so differently) they claim that the decision was in excess of the statutory authority granted the Service under 39 U.S.C. § 601(b), and therefore in violation of 5 U.S.C. § 706(2)(B). In a nutshell, the Unions contend that the Service applied the wrong legal standard in deciding to suspend international remailing monopoly. They further contend that the Service failed to develop an adequate record upon which to base its decision, and that it drew incorrect inferences from the record that did exist. The Service has met the Unions' contentions on the merits, and has argued in addition that the Unions lack standing to challenge its decision.

---

1. According to the Unions' complaint, the American Postal Workers Union represents approximately 250,000 Service employees "in the clerk, maintenance, special delivery messenger, and motor vehicle service crafts nationwide." Comp. at ¶ 4. The National Association of Letter Carriers represents approximately 220,000 Service employees "in the city letter carrier craft nationwide." Comp. at ¶ 5.

The matter came before the Court on the parties' cross-motions for summary judgment. On October 17, 1988, the Court granted judgment in favor of the Service. As further explained herein, the Court concluded that the Unions do not enjoy standing to challenge the Service's decision in this matter, and further, that the Service's decision did not violate the APA.

## DISCUSSION

1. *Standing*

The Service contends that the Unions lack standing because they have not been able to show an actual or threatened injury to their membership, and because they are not within the "zone of interests" that the PES are designed to protect. This Court disagrees that the Unions have not shown a sufficient actual or threatened injury, but agrees with the Service that the Unions are not within the "zone of interest" that the PES are designed to protect.

■ An essential element of standing in an Article III court, whether suit has been brought to review agency action or otherwise, is that the plaintiff must be capable of showing actual or threatened injury. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–2205, 45 L.Ed.2d 343 (1975). The Service contends that the Unions have made no such showing here, in that they have offered no proof that their respective memberships have lost jobs or been expressly threatened with the loss of jobs.

■ The Service is correct; the Unions have made no such showing. However, the Unions have not attempted to make such a showing. Instead, the Unions allege that the decision to permit private international remailing, with its attendant loss of revenue to the Service, inflicts harm upon its membership through the loss of "employment opportunities." Compl. at ¶ 16. The Unions reason that, even if no jobs are directly lost, the relinquishment of international remailing to the private sector reduces the current membership's opportunity to engage in international remailing, and thereby reduces the membership's opportunity to obtain "work time, overtime, em-ployment opportunities, future benefits and ... morale." Pl. Mem. at 8 (quoting *National Association of Letter Carriers, AFL–CIO v. Independent Postal System of America*, 470 F.2d 265, 270 (10th Cir. 1972)).

The Court agrees with the Unions that the reasonable prospect of reduced employment opportunities, even if no specific loss currently can be shown, satisfies the "threatened injury" requirement of standing. There is authority from the Tenth Circuit for this finding in a context virtually identical to that presented here. *See American Postal Workers Union, AFL–CIO v. React Postal Services*, 771 F.2d 1375, 1380 (10th Cir.1985) (whenever private entity permitted to perform postal functions contrary to the PES, the "employment opportunities of the postal workers are inevitably reduced"); *National Association of Letter Carriers, AFL–CIO, supra*, 470 F.2d at 270 (injury in fact due to "significant" loss of employment opportunity where PES not complied with). This conclusion is further consistent with authority in this Circuit arising in slightly different contexts. *See, e.g., Intern'l Union of Bricklayers v. Meese*, 761 F.2d 798, 802 (D.C.Cir.1985) (union had standing because guidelines allowing aliens to enter workforce would interfere with jobs which "would otherwise likely go to union members"); *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984) (alleged loss of "employment opportunity," though no loss of present jobs shown, sufficient to confer standing); *National Treasury Employees Union v. Horner*, 659 F.Supp. 8, 12 (D.D.C. 1986) (union had standing where agency action would permit outside competition with membership).

However, the Court disagrees with the Union on the question of whether the interests asserted here fall within the "zone of interest" implicated by the PES. In *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), the Supreme Court expanded upon its prior holdings that, in addition to the constitutional requirement of injury in fact, a plaintiff seeking review of agency action under

5 U.S.C. § 702 must show that he or she falls within the "zone of interests" protected by the statute at issue. This additional requirement, termed a "gloss on the meaning of § 702," 107 S.Ct. at 758 n. 16, serves as "a guide for deciding whether, in view of Congress' evident intent to make agency action reviewable, a particular plaintiff should be heard to complain of a particular agency decision." 107 S.Ct. at 757. In situations such as this, where the plaintiff is not the object of the agency action, but instead complains of the indirect consequences of that action, the test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id.

Here, the avowed interests of the Unions' respective memberships—the retention of employment opportunities—simply bear no reasonable relationship to the purposes of the PES. The PES monopoly was designed to ensure only that the Service maintains sufficient revenue to be able to provide efficient and effective mail delivery services to all aspects of the market. The Service retains the express authority to suspend that monopoly when the public interest requires such a suspension. There is simply no evidence that the PES was intended to provide, even indirectly, job security for Service employees, or that job security for Service employees furthers in any way the purposes of the PES. The interests asserted by the Unions simply bear no relation to the purposes and poli-

cies implicit in the PES—indeed, they might well diverge in certain situations[2]—and it is therefore reasonable to assume that Congress did not intend for Service employees to enjoy the right to review the Service's decisions with respect to the PES.

The Unions' position, in essence, fails to distinguish between the harm required to establish injury—essentially a quantitative determination—and the harm required to bring a plaintiff within the "zone of interest" test—essentially a qualitative determination. Alternatively, the distinction can be seen as one between a "zone of interest" and a "zone of consequence." Judge Wilkey's opinion in Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 144–45 (D.C.Cir.1977), is helpful in this regard. There, Judge Wilkey excluded from the "zone of interest" of a provision of the Internal Revenue Code a person whose competitive position had been injured by the IRS's interpretation of the statute.[3] Judge Wilkey wrote, in an analysis that is quite apposite here:

> Every decision by a government agency generates consequences and various forms of impact on a wide range of valid interests held by a diverse range of parties. There is no doubt that the decisions embodied in the challenged revenue rulings have had an impact on [appellant]. But the concepts of consequence and impact are not the proper guideposts to define the relevant zone of interests; reference to these concepts does not aid greatly in determining whether a protect-

2. The "interest" created by the PES is in maintaining sufficient revenue, by means of a monopoly, to permit the Service to serve the totality of the mail-delivery market in the United States. As Congress expressly recognized in 39 U.S.C. § 601(b), there may be situations in which the "interest" of the PES may be achieved without benefit of the monopoly. Yet, anytime private entities engage in mail delivery of virtually any type, the employment opportunities of Service employees will arguably be endangered. As a result, Service employees and their Unions will always have an incentive to challenge a suspension of the PES, without regard to the relationship between the suspension and the "public interest" as contemplated by § 601(b). Thus, even when the "interest" protected by the PES clearly and unequivocally favors a suspen-

sion, the Unions will nevertheless have an interest in challenging the suspension. In this respect, the "interests" of the Union and the "interest" created by the PES not only do not converge, but in certain circumstances clearly diverge.

3. Although the Tax Analysts decision did not involve review of an agency decision, as did Clarke, it applied the "zone of interest" test first developed in Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In Clarke, however, the Supreme Court expressly reiterated and reaffirmed the strength of the test as first announced in Data Processing.

ed interest exists, but rather serve as part of the vocabulary in defining the relationship between an alleged injury and an asserted interest.

Thus, *consequences* and *forms of impact* do play an important role in the law of standing; these concepts are relevant in determining whether there has been *injury in fact*. . . . We cannot define the zone of interests as being the equivalent in every case of the "zone of impact" or the "zone of consequences." To do so would establish a standing doctrine based solely on the existence of harm to a party.

(emphasis in original). *See also Leaf Tobacco Exporters Ass'n. Inc. v. Block,* 749 F.2d 1106, 1116 (4th Cir.1984) ("[E]very executive action portends endless adverse impacts and infinite adverse ramifications. We decline to convert the zone of interests test to one that calibrates zones of impact or zones of consequence."). Here, as in the above-cited decisions, while the Service's decision may have an *impact* upon the employment opportunities of the Unions' members, that impact is simply not of a type that falls within the zone of interests implicated by the PES, even taking into consideration the liberal teachings of *Clarke.*[4] The Union's members therefore do not have standing under 5 U.S.C. § 702 to challenge the Service's decision to suspend the Service's monopoly over private remailing.

2. *Violations of the Administrative Procedures Act*

■ Even if the Unions had standing to challenge the Service's decision, however, it is apparent from the record that their challenge would fail under the APA.

The Unions' first contention, that the Service exceeded its statutory authority in suspending the monopoly, rests upon the claim that the language of 39 U.S.C. § 601(b) requires that the Service find something close to a compelling public need before it may suspend the monopoly in any segment of the mail delivery market. The Unions assert that the Service's decision therefore violated 5 U.S.C. § 706(2)(B), because the record upon which the Service based its decision did not reflect such a compelling public need.

Although it appears that no court has interpreted § 601(b) in this context, the Court is comfortable that the Service bears no such heightened burden in justifying its actions. The "public interest . . . requires" language that is at issue here also authorizes myriad forms of agency action throughout the United States Code. Yet, to this Court's knowledge, it has never been construed to impose upon an agency the heightened standard that the Unions request here. Indeed, the opposite would appear to be true; the "public interest . . . requires" language appears to suggest substantial discretion in an agency to define the public interest in a given situation and to act accordingly. Rather than indicating Congress' desire to cabin the Service's discretion, the language of § 601(b) implies to this Court, based upon the operation of similar language elsewhere, a desire to vest the Service with substantial discretion. *See, e.g., F.C.C. v. WNCN Listeners Guild,* 450 U.S. 582, 593–94, 101 S.Ct. 1266, 1273–74, 67 L.Ed.2d 521 (1981) ("public interest" language deemed to grant agency broad discretion).

Here, the Service made an express finding that the public interest, as expressed in the responses to its notice of proposed rulemaking, favored the entry of private firms into the international remailing market. Although the Unions are entitled to quarrel, and do quarrel, with the Service's conclusion that the record supports its decision, it appears that the Service applied the proper standard here, and therefore did not

---

4. Although the specifics of this situation clearly support the conclusion reached, the logic of the result is strengthened when one considers that a contrary holding would implicitly grant standing under § 702 to *any* agency employee whose job or employment opportunities were threatened as a result of an agency decision. At bottom, the Unions here seek standing because the Service's decision will likely result in re-duced revenue for the service, and, as a result, reduced employment opportunities for Service employees. Yet, agencies make decisions *every day* that affect the allocation of resources within and among agencies, and thus affect the job prospects of agency employees. It is unreasonable, at least in the consideration of this Court, to assume that Congress intended to make § 702 available to any disgruntled agency employee.

act in excess of its statutory authority under § 601(b).

■ The Unions' second contention under the APA is that the Service's decision was "arbitrary, capricious and an abuse of discretion," and therefore in violation of 5 U.S.C. § 706(2)(A). The Unions contend, in essence, that the Service's decision was not based upon adequate evidence that the public interest supports private international remail, and that the Service did not consider the proper factors regarding the revenue effects of its decision.

This Court disagrees. Under the Supreme Court's articulation of the arbitrary and capricious analysis in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), an agency need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' "

Here, the administrative record indicates that the Service initially promulgated a rule designed to perpetuate the Service's monopoly over international remailing. This initial position met with strong, nearly unanimous public opposition to a continuation of the monopoly over this segment of the market, including opposition from vari-

ous government officials.[5] In response to this strenuous opposition, the Service sought the public's reaction to a suspension of the monopoly and a transfer of international remailing to the private sector. The public reaction the second time around was somewhat limited; only twenty-five responses were received, but again, nearly all favored private international remailing. Based upon these responses, and conceding that the public input lacked to some extent the factual specificity the Service had hoped for,[6] the Service's issuing release stated as follows:

> The comments were almost universally consistent in their observations regarding the level of service provided by [private] remailers. Specifically, the comments asserted that remailing was faster than U.S. airmail and that this time savings is often critical to the ability of American businesses to compete in foreign markets. Moreover, the comments asserted that remailing services were provided for a lesser cost than U.S. airmail, thereby also enhancing the ability of American firms to compete abroad. Although the Postal Service did not receive across-the-board data on the level of service provided by remailers many commenters did provide information, testimonial in nature, indicating that their

---

5. The Service's proposal to *retain* the monopoly over international remailing, first published October 10, 1985, was opposed by, among others, James Miller, Director of the Office of Management and Budget, Beryl Sprinkel, Chairman of the Counsel of Economic Advisors, Malcolm Baldridge, Secretary of Commerce, Congressmen Mickey Leland, Frank Horton and Robert Garcia, members of the Subcommittee on Postal Operations and Services, and the Attorney General.

6. In its issuing release, the Service specifically noted the objection that the Unions had raised at the notice and comment stage, and that they reiterate here—that the record lacks sufficient empirical data to justify the Service's conclusion that the public interest supports a suspension. In the release, however, the Service responded that "[i]t may well be ... that, because of the diverse character of the remail industry and the relatively recent development of remailing, the comprehensive information we had hoped to receive to supplement the essentially anecdotal information, which was furnished to us, is not available. Nonetheless, the Postal Service has

compiled a record which appears to demonstrate the existence of a public benefit and to support the suspension." 51 Fed.Reg. at 29637. The Court regards the Service's response as adequate under the circumstances, and does not view the relative dearth of empirical data as undermining the Service's evaluation of the "public interest." *See, e.g., F.C.C. v. Nat'l Citizens Comm. for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121–22, 56 L.Ed.2d 697 (1978) (factual specificity not always required where "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency") (quoting *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)); *Nat'l Ass'n of Regulatory Utility Commissioners v. F.C.C.*, 737 F.2d 1095, 1140–41 (D.C.Cir.1984) (absence of complete factual support not fatal to agency decision under arbitrary and capricious review; even though "an agency's decision is a difficult one, or that the decision rests on a set of evidentiary facts less desirable or complete than one which would exist in some regulatory utopia does not alter our role").

use of remail services has resulted in time and cost savings. Numerous commenters noted that this time and cost differential was critical in order for letter matter being sent abroad to retain its commercial value. Several commenters also stated that without faster and cheaper services provided by remailers, it would not be feasible for their business to compete in the international markets. The Postal Service found it significant that the comments received in response to the October 10 notice, which proposed language to make clear that [the monopoly applies to international remailing], were overwhelming in their support of remailing. The Department of Commerce informed us that international remailing is of benefit to American businesses in foreign markets, a position also reflected in comments from the Department of Justice and the Office of Management and Budget.

51 Fed.Reg. at 29637. The Service's explanation of its decision and the bases therefore, while perhaps lacking the factual specificity that might exist in a "regulatory utopia," can hardly be regarded as arbitrary, capricious and an abuse of discretion. Section 601(b) expressly entrusted the Service with the task of deciding whether the public interest supports a continued monopoly over international remailing, and this Court simply cannot conclude, on the record before it, that the Service carried out its task in a manner that would justify judicial intervention. The Service has identified the factors supporting its decision, drawn rational inferences where detailed facts did not exist, and drawn a rational connection between the facts found and the decision made. The APA requires no more.

Because the Service's decision was not in excess of statutory authority, and was not arbitrary, capricious and an abuse of discretion, the Service would be entitled to judgment as a matter of law even if the Unions had standing to bring this action.